**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRITTANY TURNER, on behalf of her minor child, S.T., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL OF CHICAGO,<br><br>Defendant. | Case No.: 1:24-cv-6290<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brittany Turner, on behalf of her minor child, S.T., ("Plaintiff") brings this Class Action Complaint against Defendant Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie Children's" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Healthcare providers that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2. The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their

lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3. As a healthcare provider, Lurie Children's knowingly obtains patient PII and PHI and has a resulting duty to securely maintain such information in confidence.

4. Lurie Children's expressly recognizes its duty to safeguard patient PII and PHI, stating: "Lurie Children's believes in protecting the privacy of your health information."[1]

5. Defendant's commitment to safeguarding patient PII and PHI nevertheless fell flat, when cybercriminals were able to access Lurie Children's computer systems between January 26 and January 31, 2024, compromising a wide range of patient PII and PHI (the "Data Breach").

6. Despite the cyberattack occurring in January 2024, Defendant did not begin notifying patients that their PII and PHI had been compromised in the Data Breach until on or about June 27, 2024, approximately five months after the Data Breach occurred.[2]

7. Based on the information provided by Lurie Children's to date, a wide variety of PII and PHI was implicated in the Data Breach, including but not limited to, patients' names, addresses, dates of birth, dates of service, driver's license numbers, email addresses, health claims information, health plans, health plan beneficiary numbers, medical conditions or diagnoses,

---

[1] *Notice of Privacy Practices*, Ann & Robert Lurie Children's Hospital of Chicago, https://www.luriechildrens.org/en/privacy-legal-information/notice-of-privacy-practices/ (last visited July 24, 2024).

[2] *Data Breach Notifications*, Office of the Maine Attorney General (June 27, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/64c3b313-0c3c-4820-af10-6afef36d08e1.html.

medical record numbers, medical treatment, prescription information, Social Security numbers, and telephone numbers.[3]

8. As a direct and proximate result of Defendant's inadequate data security, and its breach of its duty to handle PII and PHI with reasonable care, Plaintiff's and Class Members' PII and PHI has been accessed by unauthorized third parties and exposed to an untold number of unauthorized individuals.

9. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, medical insurance fraud, and similar forms of criminal mischief—risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff, on behalf of her minor child and the Class as defined herein, brings claim for negligence, negligence *per se*, breach of breach of implied contract, unjust enrichment, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

## PARTIES

11. Plaintiff Brittany Turner is an adult, and the natural parent of her minor daughter, S.T., who at all relevant times, is and was a citizen of the State of Illinois. Plaintiff's minor child was a patient at Lurie Children's, and Plaintiff received a data breach notice from Defendant, informing her that her minor daughter's PII and PHI had been compromised in the Data Breach.

---

[3] *Lurie Children's Notifies Individuals of Data Breach*, Ann & Robert Lurie Children's Hospital of Chicago, https://www.luriechildrens.org/en/lurie-childrens-notifies-individuals-of-data-breach/ (last visited July 24, 2024).

12. Defendant Lurie Children's is an Illinois not-for profit corporation with a principal place of business located at 225 E. Chicago Ave, Chicago, Illinois 60611.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

14. This Court has general personal jurisdiction over Defendant because Lurie Children's resides in State of Illinois.

15. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business within this District.

## FACTUAL BACKGROUND

### A. Lurie Children's Collects and Stores Patient PII and PHI.

16. Lurie Children's is the one of the largest pediatric healthcare providers in the Midwest, with more than 1,800 physicians and health professions across 70 pediatric specialties.[4]

17. Lurie Children's provides healthcare services to more than 239,000 children per year across its fifty-four locations.[5]

---

[4] *Facts & Figures*, Ann & Robert Lurie Children's Hospital of Chicago, https://www.luriechildrens.org/en/who-we-are/facts-figures/#:~:text=of%20Important%20Facts-,Our%20Patients,at%20Lurie%20Children's%20each%20year (last visited July 24, 2024).

[5] *Id.*; *Locations*, Ann & Robert Lurie Children's Hospital of Chicago, https://www.luriechildrens.org/en/locations/ (last visited July 24, 2024).

18. While administering healthcare services, Defendant receives, creates, and handles PII and PHI, which includes, *inter alia*, patients' names, addresses, dates of birth, dates of service, driver's license numbers, email addresses, health claims information, health plans, health plan beneficiary numbers, medical conditions or diagnoses, medical record numbers, medical treatment, prescription information, Social Security numbers, and telephone numbers.

19. Patients must entrust their PII and PHI to Lurie Children's to receive healthcare services, and, in return, they reasonably expect that Defendant will safeguard their highly sensitive information and keep their PHI confidential.

20. By obtaining, collecting, and storing Plaintiff's and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures. Lurie Children's exemplifies its understanding of these duties; in its posted Data breach Notice, Defendant states that "[a]t Lurie Children's, we take seriously the privacy of our patients' . . . sensitive information."[6]

21. Despite Lurie Children's duty to safeguard Plaintiff's and Class Members' PII and PHI, however, Defendant employed inadequate data security measures to protect and secure the PII and PHI patients entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI.

---

[6] *Lurie Children's Notifies Individuals of Data Breach*, *supra* note 3.

**B. Lurie Children's Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to its Patients.**

22. At all relevant times, Defendant was well aware that the patient PII and PHI which it acquires and stores is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

23. Defendant also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

24. These risks are not theoretical; in the last year alone, numerous high-profile PII and PHI breaches have been reported to the Department of Health and Human Services at business such as Cencora (formerly AmerisourceBergen), Sav-Rx, Aetna, HCA Healthcare, Inc., and many others.[7]

25. PII and PHI have considerable value and constitute an enticing and well-known target to hackers. Hackers easily can sell stolen data as well as the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[8] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

26. PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150

[7] U.S. Dep't of Health & Human Servs. Off. for Civ. Rts., *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited July 24, 2024).
[8] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[9]

27. A recent study reported that 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[10]

28. With respect to healthcare data breaches, another study found that "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft." The same study stated that "[a]ctors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures." [11]

29. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 3,205 publicly disclosed data

---

[9] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited July 24, 2024).

[10] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4 (Mar. 7, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

[11] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, Health IT Sec. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

compromises, affecting over 353 million victims. The U.S. specifically saw a 72% increase in data breaches from the previous all-time high in 2021 and a 78% increase over the previous year.[12]

30. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[13] In 2023 alone, about one-third of Americans was affected by health-related data breaches.[14]

31. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2019, roughly 3.5 million people reported some form of identity theft, fraud, or other consumer complaint compared to 5.4 million people in 2023.[15]

32. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[16] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use

---

[12] *2023 Data Breach Report*, Identity Theft Resource Center (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[13] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (Jan. 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[14] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[15] *Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Key%20Facts (last visited July 24, 2024).

[16] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited July 24, 2024).

software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[17]

33. Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[18]

34. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

35. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

36. The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address,

---

[17] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in %20victims'%20names.

[18] *Id.*

> remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[19]

37. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

38. **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[20]

39. **Medical Records—**As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[21] A complete identity theft kit that includes health insurance

---

[19] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[20] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

[21] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[22]

40. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[23]

41. Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

---

[22] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PricewaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited July 24, 2024).

[23] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

42. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

43. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[24] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[25]

44. Based on the value of Plaintiff's and Class Members' PII and PHI to cybercriminals, Lurie Children's knew or should have known, the importance of safeguarding the patient PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. Defendant, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**C. The Data Breach.**

45. On or about February 1, 2024, Defendant announced that it was experiencing a cybersecurity incident and took its network systems offline in response.[26]

[24] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[25] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[26] Bill Toulas, *Lurie Children's Hospital took systems offline after cyberattack*, BleepingComputer (Feb. 2, 2024), https://www.bleepingcomputer.com/news/security/lurie-childrens-hospital-took-systems-offline-after-cyberattack/.

46. Approximately a week later, Lurie Children's confirmed that the cybersecurity incident was actually a cyber-attack, during which threat actors had gained access to Defendant's computer network.[27]

47. In response to the Data Breach, Lurie Children's conducted an investigation into the cyber-attack and confirmed that between January 26 and 31, 2024, threat actors were able to gain access to its computer network, compromising patient PII and PHI, including addresses, dates of birth, dates of service, driver's license numbers, email addresses, health claims information, health plans, health plan beneficiary numbers, medical conditions or diagnoses, medical record numbers, medical treatment, prescription information, Social Security numbers, and telephone numbers.[28]

48. Upon information and belief, the Data Breach was a targeted attack that resulted in the successful exfiltration of patient PII and PHI. On or about February 28, 2024, a notorious ransomware gang took responsibility for the Data Breach, claiming to have stolen 600 gigabytes of data from Defendant's computer network. The ransomware gang further advertised the stolen information for sale on its extortion portal on the dark web, offering to sell the stolen data for $3.7 million dollars to a single buyer.[29] The ransomware gang last updated its listing on the dark web, claiming that "All data was sold."[30]

---

[27] Dave Muoio, *Lurie Children's Hospital says nearly 800k patients' data compromised in cyberattack*, Fierce Healthcare (July 1, 2024), https://www.fiercehealthcare.com/providers/cybersecurity-matter-forces-lurie-childrens-hospitals-communications-mychart-offline.
[28] *Lurie Children's Notifies Individuals of Data Breach*, *supra* note 3.
[29] Bill Toulas *Rhysida ransomware wants $3.6 million for children's stolen data*, Bleeping Computer (Feb. 28, 2024), https://www.bleepingcomputer.com/news/security/rhysida-ransomware-wants-36-million-for-childrens-stolen-data/.
[30] Alexander Martin, *Ransomware gang claims to have made $3.4 million after attacking children's hospital*, The Records (Mar. 7, 2024), https://therecord.media/ransomware-gang-claims-payment-luries.

49. Despite the Data Breach occurring in January 2024, and the threat actors responsible for the Data Breach claiming to have sold the information stolen during the Data Breach, Lurie Children's did not begin notifying impacted individuals of the Data Breach until on or about June 27, 2024, approximately five months after the Data Breach occurred.

50. According to Lurie Children's filing with the Office of the Maine Attorney General, the PII and PHI of approximately 790,000 individuals was compromised in the Data Breach.[31]

51. Upon information and belief, the Data Breach and resulting theft of hundreds of thousands of individuals' PII and PHI is the direct and proximate result of Lurie Children's failure to implement sufficient safety and security protocols.

**D. Lurie Children's is Obligated under HIPAA to Safeguard Patient PII and PHI.**

52. Lurie Children's is required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA") to safeguard patient PHI.

53. As a healthcare provider, Lurie Children's is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

54. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

55. Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

56. Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from

[31] *Data Breach Notifications*, *supra* note 2.

an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

57. HIPAA requires Lurie Children's to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R.§ 164.102, *et. seq*.

58. HIPAA's security rules also require a covered entity to report a data breach without unreasonable delay and in no case later than sixty (60) calendar days from the discovery of the breach.[32]

59. HHS further recommends the following data security measures a covered entity such as Lurie Children's should implement to protect against some of the more common, and often successful, cyber-attack techniques:

a. Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

b. Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

[32] *What are the HIPAA Breach Notification Requirements?*, HIPAA Journal (Feb. 1, 2024), https://www.hipaajournal.com/hipaa-breach-notification-requirements.

c. Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

d. Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

e. Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[33]

60. Upon information and belief, Lurie Children's failed to implement one or more of the above recommended data security measures.

61. While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to unauthorized third parties, nor did Plaintiff or the Class Members consent to the disclosure of their PHI to unauthorized third parties.

62. As such, Lurie Children's is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

63. Given the application of HIPAA to Lurie Children's, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive necessary medical care, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

[33] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S Dep't. of Health & Human Services (last updated Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

**E. Lurie Children's Failed to Follow FTC Guidelines and Industry Best Practices.**

64. Lurie Children's is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

65. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[34]

66. In 2016, the FTC updated its publication titled "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses.[35] The guidelines recommend that business implement the following:

a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

---

[34] *Start with Security: A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[35] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, October 2016, available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 24, 2024).

67. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

68. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69. Upon information and belief, Lurie Children's failed to properly implement one or more of the basic data security practices recommended by the FTC. Lurie Children's failure to employ reasonable and appropriate data security measures to protect against unauthorized access individuals' PII and/or PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

---

[36] *See Start with Security: A Guide for Business*, Federal Trade Commission, June 2015, available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited July 24, 2024).

70. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[37]

71. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[38] Upon information and belief, Lurie Children's failed to adhere to the NIST guidance.

72. Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare sector, including implementing the following measures to defend against common cyberattacks:

a. Email protection systems and controls;

b. Endpoint protection systems;

c. Identify all users and audit their access to data, application, systems, and endpoints;

d. Data protection and loss prevention measures;

e. IT asset management;

f. Network management;

g. Vulnerability management;

h. Security operations center & incident response; and

[37] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards and Technology (April 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[38] *Id.* at Table 2 pg. 26-43.

i. Cybersecurity oversight and governance policies, procedures, and processes.[39]

73. The Federal Bureau of Investigation ("FBI"), the U.S. Cybersecurity and Infrastructure Security Agency ("CISA"), and the Multi-State Information Sharing and Analysis Center ("MS-ISAC") also issued a joint cybersecurity advisory about the ransomware gang responsible for the Data Breach, including several data security steps to block the group's main attack vectors; restrict lateral movement, and detect an attack in process. These recommendations included: enabling phishing-resistant multifactor authentication; disabling command-line and scripting activities and permission; restricting the use of PowerShell; enhancing PowerShell logging and logging with processes; restricting the use of Remote Desktop Protocol; and securing remote access through application controls.[40]

74. Upon information and belief, Lurie Children's failure to protect massive amounts of PII and PHI is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices, along with recommendations made in the joint security advisory.

75. Lurie Children's was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so. Despite understanding the risks and consequences of maintaining inadequate data security, Lurie Children's nevertheless failed to comply with its data security obligations, leading to the compromise of Plaintiff's and Class Members' PII and PHI.

---

[39] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited July 24, 2024).

[40] Steve Alder, *Feds Issue Updated Mitigations for Blocking Rhysida Ransomware Attacks*, HIPAA Journal (Nov. 16, 2023), https://www.hipaajournal.com/updated-mitigations-rhysida-ransomware-nov-23/.

**F. Plaintiff and Class Members Suffered Damages.**

76. For the reasons mentioned above, Lurie Children's conduct, which allowed the Data Breach to occur, caused Plaintiff, and members of the Class, significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

77. Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Lurie Children's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

78. As a result of Lurie Children's failures, Plaintiff and Class Members are also at substantial increased risk of suffering identity theft and fraud or misuse of their PII and PHI, especially after the information stolen in the Data Breach was sold on the dark web.

79. With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[41]

[41] *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, DistilINFO GOVHEALTH (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/.

80. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[42]

81. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[43]

82. Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[44]

83. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[45]

84. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Lurie Children's fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

---

[42] *Id.*
[43] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[44] *Id.*
[45] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited July 24, 2024).

85. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

**G. Plaintiff's Experience.**

86. Plaintiff's minor child, S.T., was a patient of Lurie Children's. In order to receive healthcare services for her minor child, Plaintiff was required to entrust Lurie Children's with her minor child's PII and PHI. In collecting and maintaining the PII and PHI of Plaintiff's minor child, Defendant undertook a duty to act reasonably in its handling of S.T.'s PII and PHI. Lurie Children's, however, did not take reasonable care of S.T.'s PII and PHI, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

87. Plaintiff received a data breach letter from Lurie Children's informing her that her minor child's PII and PHI she provided to Defendant was compromised in the Data Breach. The Data Breach letter put the onus on Plaintiff to protect her minor child's PII and PHI, recommending that she "remain vigilant and to carefully review your online accounts, financial statements, and Explanations of Benefits from your health insurers for any unauthorized activity."

88. Since the announcement of the Data Breach, Plaintiff has been required to spend her valuable time and effort taking steps to mitigate the risk of misuse of her minor child's PII and PHI. Specifically, Plaintiff has been required to spend her valuable time and effort monitoring her various accounts in an attempt to mitigate the misuse of her minor child's PII and PHI. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

89. Since the Data Breach, Plaintiff has noticed a significant uptick in the number of spam calls and spam emails as opposed to the time before the Data Breach.

90. Plaintiff's minor child has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of her PII and PHI; (b) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

91. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff's minor child faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

92. In addition, knowing that an unauthorized third party accessed and likely exfiltrated and her minor child's PII and PHI and this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## CLASS ACTION ALLEGATIONS

93. Plaintiff brings this Class Action on behalf of herself and all other similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

94. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the Data Breach of Lurie Children's systems which occurred between January 26 and January 31, 2024.

95. Excluded from the class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

96. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

97. **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are at least millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Lurie Children's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 790,000 individuals.

98. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Lurie Children's had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Lurie Children's was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Lurie Children's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Lurie Children's wrongful conduct.

99. **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful

and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

100. **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

101. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

102. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Lurie Children's liability and the fact of damages is common to Plaintiff and each member of the Class. If Lurie Children's breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

103. **Injunctive Relief:** Lurie Children's has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

104. **Ascertainability:** Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Lurie Children's books and records.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

105. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

106. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

107. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

108. Lurie Children's had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Lurie Children's was obligated to act with reasonable care to protect against these foreseeable threats.

109. Further, Lurie Children's also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

110. Lurie Children's duty also arose from Defendant's position as a healthcare provider. Lurie Children's holds itself out as a trusted provider of healthcare, and thereby assumes a duty to reasonably protect its patients' sensitive information. Lurie Children's directly provides comprehensive healthcare services and was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

111. Further, Lurie Children's duty arose from various statutes requiring Defendant to implement reasonable data security measures, including but not limited to: Section 5 of the FTC Act and HIPAA. For example, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

112. Similarly, HIPAA is a further source of Defendant's duty to Plaintiff and the Class, as HIPAA required Lurie Children's to take reasonable measures to protect Plaintiff's and the Class's sensitive data. Specifically, HIPAA required Lurie Children's to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures

of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*. By failing to implement reasonable data security measures, Defendant acted in violation of HIPAA.

113. Lurie Children's breached the duties owed to Plaintiff and Class Members and thus was negligent. As a result of unauthorized access of Defendant's systems that compromised Plaintiff's and Class Members' PII and PHI, Lurie Children's breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

114. But for Lurie Children's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

115. As a direct and proximate result of Lurie Children's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

116. As a direct and proximate result of Lurie Children's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

117. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

118. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair acts or practices by entities such as Defendant for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

119. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Lurie Children's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving PII and PHI of its patients.

120. Lurie Children's violation of Section 5 of the FTC Act constitutes negligence *per se*.

121. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

122. Defendant is an entity covered under HIPAA which sets minimum federal standards for privacy and security of PHI.

123. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

124. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

125. Lurie Children's violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

126. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect.

127. Lurie Children's violation of HIPAA constitutes negligence *per se*.

128. The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and HIPAA was intended to guard against.

129. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 115 above.

130. As a direct and proximate result of Lurie Children's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

131. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

132. When Plaintiff and Class Members provided their PII and PHI to Lurie Children's, they entered into implied contracts with Defendant, under which Defendant agree to take reasonable steps to protect Plaintiff's and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

133. Lurie Children's solicited and invited Plaintiff and Class Members to provide their PII and PHI as part of Defendant's provision of healthcare services. Plaintiff and Class Members accepted Defendant's offers and provided their PII and PHI to Defendant.

134. Implicit in the agreement between Plaintiff and Class Members and Lurie Children's, was Defendant's obligation to: (a) use such PII and PHI for business purposes only; (b) take reasonable steps to safeguard Plaintiff's and Class Members' PII and PHI; (c) prevent unauthorized access and/or disclosure of Plaintiff's and Class Members' PII and PHI; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII and PHI; (e) reasonably safeguard and protect the PII and PHI of Plaintiff and Class Members from unauthorized access and/or disclosure; and (f) retain Plaintiff's and Class Members' PII and PHI under conditions that kept such information secure and confidential.

135. When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and PHI and to timely notify them in the event of a data breach.

136. Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII and PHI from unauthorized access and disclosure. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Lurie Children's failed to do so.

137. Plaintiff and Class Members would not have provided their PII and PHI to Lurie Children's had they known that Defendant would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

138. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

139. Lurie Children's breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach

140. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 115 above.

141. As a direct and proximate result of Lurie Children's breach, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

142. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

143. Upon information and belief, Lurie Children's funds its data security measures from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

144. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

145. Plaintiff and Class Members conferred a monetary benefit on Lurie Children's. Specifically, they purchased healthcare services from Defendant and/or its agents and in so doing provided Defendant with their PII and PHI.

146. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

147. Lurie Children's knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

148. In particular, Lurie Children's enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

149. Under the principles of equity and good conscience, Lurie Children's should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

150. Defendant failed to secure Plaintiff's and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon Lurie Children's.

151. Defendant acquired Plaintiff's and Class Members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

152. If Plaintiff and Class Members knew that Lurie Children's had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

153. Plaintiff and Class Members have no adequate remedy at law.

154. As a direct and proximate result of Lurie Children's conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 115 above.

155. Lurie Children's should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Lurie Children's services.

## FIFTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Class)

156. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

157. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

158. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Lurie Children's is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and PHI and remains at imminent risk that further compromises of her PII and/or PHI will occur in the future.

159. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a. Lurie Children's owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

b. Lurie Children's breached and continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

160. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

161. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of any of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiff will not have an adequate remedy at law because

many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

162. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

163. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of her minor child and all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For compensatory damages on behalf of Plaintiff and the Class;

D. For punitive damages on behalf of Plaintiff and the Class;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Declaratory and injunctive relief as described herein;

G. For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I. Awarding pre- and post-judgment interest on any amounts awarded;

J. For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K. Awarding of such other and further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff demands a trial by jury as to all issues so triable in this action.

Dated: July 24, 2024

Respectfully submitted,

*/s/ Katrina Carroll*
Katrina Carroll
**LYNCH CARPENTER, LLP**
111 W. Washington St.
Suite 1240
Chicago IL 60602
T: (312) 750-1265
katrina@lcllp.com

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com

*Counsel for Plaintiff and the Proposed Class*